## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | | |
|---|---|---|
| JACOB MARULLO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File |
| vs. | ) | No. _____ |
| | ) | |
| RIVIAN AUTOMOTIVE, LLC, | ) | |
| RIVIAN AUTOMOTIVE, INC., | ) | **COMPLAINT** |
| JOHNNY DEUTSCH and WASSYM | ) | |
| BENSAID, in their individual and | ) | |
| professional capacities, | ) | **Jury Trial Demanded** |
| | ) | |
| Defendants. | ) | |

Plaintiff Jacob Marullo hereby alleges as follows:

## PRELIMINARY STATEMENT

1.     Jacob Marullo joined Rivian as a Senior Cybersecurity Leader in September 2020, excited to be part of an organization that appeared to be leading one of the technologies of the future (electric vehicles) and which offered equity as part of the compensation package that had significant upside.

2.     Over the following year, Mr. Marullo observed and objected to various practices by his supervisor, Chief Information Security Officer Johnny Deutsch, that he believed were fraudulent and primarily intended to benefit Mr. Deutsch rather than Rivian.  Mr. Marullo noted that Mr. Deutsch was bringing in

1

and pressuring Mr. Marullo to use vendors and contractors based purely upon personal relationships and connections, rather than on a competitive basis as he was supposed to be doing.

3.      In mid-2021, Mr. Marullo objected to and cautioned Mr. Deutsch, calling for more transparency regarding what he believed were deceptive practices, conflicts of interest as well as violations of federal export control laws regarding certain restricted technologies, as the vendors being used by Mr. Deutsch were based outside the United States.

4.      Soon, Mr. Deutsch began to engage in retaliatory conduct towards Mr. Marullo in the terms and conditions of his employment, leading Mr. Marullo to make a written formal complaint to Human Resources in early October 2021.  In this complaint and in several subsequent investigatory interviews over the next couple of months, Mr. Marullo reiterated his concerns regarding "unethical business practices involving improper personal relationships" with suppliers and other retaliatory conduct (including putting pressure on Mr. Marullo that caused him to stop his service with the Marines Reserves).

5.      Disturbingly, in early November 2021, just one month after Mr. Marullo first filed his written complaint, the Company proposed that he move to a different, much less desirable position due to the "friction" with Mr. Deutsch, and

even suggested that if he did not agree to this transfer that his future employment could be in question.

6.      Yet, in early January 2022, the Company informed Mr. Marullo that Mr. Deutsch had been terminated and that the investigation had partially substantiated his complaints allegations.  However, the Company would not provide Mr. Marullo with any further information.

7.      The Vice President of Software, Wassym Bensaid, became Mr. Marullo's new supervisor, and unfortunately promptly began to exhibit and ratify the Company's retaliatory animus against Mr. Marullo.  Mr. Bensaid over the next few weeks pressured Mr. Marullo to conduct various testing that would disrupt and pose a large risk of compromising the safety at the Company's manufacturing plant, especially if done on the snap basis that was being demanded.

8.      On January 27, 2022, just days after Mr. Marullo had received his objectives for the first quarter of the year, he was terminated without notice on the vague basis of performance.

9.      Mr. Marullo's concerns regarding the safety implications of haphazardly running security-related tests amid Rivian's operations are further corroborated by the fact that, upon information and belief, over the past two years, more than two dozen complaints have been made to the Occupational Safety and

3

Health Administration (OSHA) regarding safety issues, incidents and concerns at Rivian's manufacturing facilities. These complaints have included employee concerns about exposure of employees to carbon monoxide at unsafe levels, electrical hazards, exposure to toxic and hazardous chemicals, and a serious battery fire that released toxins into the air at the workplace.

10.     Therefore, because Rivian and Mr. Bensaid terminated Mr. Marullo in retaliation for his legally protected complaints and violated his rights under Section 806 of the Sarbanes-Oxley Act of 2002, 18 USC § 1514A (the "Sarbanes-Oxley Act" or "SOX"), he files the following legal claim based upon the below factual allegations.

## ADMINISTRATIVE PREREQUISITES

11.     On June 30, 2022, Plaintiff filed a Whistleblower Complaint with the Occupational Safety and Health Administration ("OSHA") in which he alleged retaliation in violation of Section 806 of the Sarbanes-Oxley Act of 2002, 18 USC § 1514A.

12.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action is brought under federal statutory law; namely, SOX.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred and/or had their impact in this district.

## PARTIES

15.    Jacob Marullo is a former Operational Technology Cybersecurity Leader/Senior Cybersecurity Leader at Rivian.  At all relevant times, Plaintiff was an "employee" under the Sarbanes-Oxley Act.  Throughout his employment at Rivian, Mr. Marullo engaged in work in Georgia, with several visits to Rivian's manufacturing facility in Normal, Illinois.

16.    Defendant Rivian Automotive, LLC is a Delaware limited liability company, with its headquarters at 13250 North Haggerty Road, Plymouth, Michigan 48170.  Rivian Automotive, LLC is a wholly owned subsidiary of Rivian Automotive, Inc.  At all relevant times, Rivian was an "employer" under the Sarbanes-Oxley Act.  Rivian has employees and business operations in Michigan, Illinois, California, as well as outside the United States, including in the United Kingdom and the Netherlands.

17.     Defendant Rivian Automotive, Inc., is a Delaware corporation, with its headquarters at 14600 Myford Road, Irvine, California 92606.  At all relevant times, Rivian was an "employer" under the Sarbanes-Oxley Act.

18.     Defendants Rivian Automotive, LLC and Rivian Automotive, Inc. share common management (including executive leadership), ownership (with the former being a wholly owned subsidiary of the latter), and resources/administration.

19.     Rivian is a publicly traded company listed on the NASDAQ stock exchange.

20.     Defendant Johnny Deutsch is a Florida resident and the former Chief Information Security Officer at Rivian.  At relevant times, Mr. Deutsch supervised the employment of Plaintiff and, accordingly, was an "employer" under the Sarbanes-Oxley Act.

21.     Defendant Wassym Bensaid is a California resident and the Vice President of Software at Rivian.  At relevant times, including at the time of Plaintiff's retaliatory termination, Wassym Bensaid supervised the employment of Plaintiff and, accordingly, was an "employer" under the Sarbanes-Oxley Act.

## **FACTUAL ALLEGATIONS**

## I.   MR. MARULLO'S WORK AT RIVIAN AND PROFESSIONAL BACKGROUND

22.   Mr. Marullo began working for Rivian in September 2020 as an Operational Technology Cybersecurity Leader/Senior Cybersecurity Leader in the Operational Technology Security group.

23.   Mr. Marullo primarily worked for Rivian from his home in Georgia, with occasional visits to the Company's Illinois manufacturing plant.

24.   Before coming to Rivian, Mr. Marullo had a long career in the cybersecurity industry, with more than 18 years of operational technology ("OT") cybersecurity experience (and a few additional years of network engineering and IT experience generally).

25.   Mr. Marullo has worked on numerous multi-billion-dollar programs as a technical leader and OT cybersecurity subject matter expert.

26.   Mr. Marullo also is a single father who has had sole custody of his children for approximately eight years.

27.   From December 1998 to December 2002, Mr. Marullo served on active duty in the Marine Corps, including in areas of operations such as Albania and Afghanistan.

28.   During his service he gained considerable experience ensuring the proper installation, configuration and operation of server systems and networks.

29.     When he left the Marines, Mr. Marullo received an honorable discharge, which included receiving the Combat Action Ribbon.

30.     Mr. Marullo then began his career in cybersecurity.

31.     In 2019, Mr. Marullo started working at Booz Allen Hamilton ("Booz Allen") as a Lead Industrial Cybersecurity Engineer, where he worked with pharmaceutical manufacturing companies on cybersecurity programs, creating, maturing, and implementing their programs for dozens of plants at each company.

32.     Mr. Marullo also worked with government clients at Booz Allen, including clients in the intelligence community and at the Department of Defense, with a focus on protecting industrial sites from cyberattacks, including from abroad.

33.     Mr. Marullo was pleased with his position at Booz Allen when Rivian recruited Mr. Marullo heavily to join the Company.

34.     Mr. Marullo decided to take a leap of faith and join a promising electronic vehicle startup in a job that allowed him to keep working from Georgia (important in light of his obligations to his family and the Marine Reserves), leading its manufacturing cybersecurity program.

35.     At Rivian, Mr. Marullo joined a four-person cybersecurity team, including Mr. Deutsch and himself.

36.     By the time Mr. Marullo's employment ended in late January 2022, there were around 30 people on the team, which had grown exponentially.

37.     Mr. Marullo was responsible for manufacturing cybersecurity, which obviously is crucial to an electronic vehicle manufacturing company like Rivian, with a team of about 30 contractors and full-time employees reporting to him as time went on during his employment.

38.     However, Mr. Marullo built his program from the ground up, and for some time was largely alone in his specific cybersecurity function, and so he set about addressing the many parts of the manufacturing plant that are connected to the internet and therefore are exposed to hacking of all kinds.

39.     Mr. Marullo received praise for his work and built many high-quality relationships with members of Rivian's manufacturing team.

40.     For most if not all of his employment at Rivian, Mr. Marullo was one of the few people with manufacturing sector experience on the cybersecurity team, and often he was the only person with experience in ensuring "life safety" at the facility in conjunction with their team's security function.  Mr. Marullo therefore often had to perform certain functions as a team of one person, and he spent many months working long hours seven days a week.

41.     Mr. Marullo worked hard to ensure that members of the cybersecurity team understood how their protective measures impacted and worked with manufacturing equipment and functions (such as by slowing things down), and that it was important to communicate directly and in detail with the manufacturing team to ensure optimal performance.

42.     Mr. Marullo made it a priority for the Company's personnel to understand the installation of security measures, including how much of it would entail a one-time event or disruption/shutdown that then would provide protection for the manufacturing environment at the Company.

43.     He appreciated and strove to meet the needs of a fast-paced startup environment where the Company was launching new vehicles and to minimize slowdowns as much as possible.

44.     Mr. Marullo helped improve the cybersecurity environment at Rivian in the face of opposition and interference from his manager, as described further below.

45.     When Mr. Marullo joined the Company, he was still in the Marine Corps Reserves (the "Reserves"), in which he had served for many years, and which requires time away from work (typically a weekend per month and two weeks a year).

46.     However, Mr. Marullo had to leave the Reserves in September 2021 because his manager, Mr. Deutsch, did not support his service and looked upon it negatively in connection with his position at the Company.

47.     Mr. Deutsch admonished Mr. Marullo for time that he spent with the Reserves on multiple occasions, including on conference calls with other team members.

48.     Mr. Deutsch reacted with irritation and annoyance when Mr. Marullo brought up Uniformed Service Employment and Reemployment Act ("USERRA") protections for his Reserves service.

49.     Mr. Marullo, given his family commitments, could not afford to be without work, and therefore did as his manager wished and left the Reserves in favor of his full-time job.  Mr. Marullo saw that taking any further time away from work for the Reserves would only further make him a target for the ire of his supervisor, Mr. Deutsch.

50.     Unfortunately, Mr. Deutsch's antipathy towards Mr. Marullo carried over to other protected complaints and activity as well.

51.     Mr. Marullo became the target of a campaign of retaliation in the fall of 2021 when he again put integrity, loyalty to the Company, and the interests of

Rivian's shareholders ahead of his manager's self-interested wishes, as discussed further below.

## II.   MR. MARULLO OBJECTS TO AN APPARENT CONFLICT OF INTEREST AND FRAUDULENT CONTRACTOR RELATIONSHIP, WHICH THREATENED TO VIOLATE FEDERAL LAW AND HARM THE COMPANY'S SHAREHOLDERS

52.    In 2021, Mr. Marullo discovered unethical, fraudulent conduct and what he believed were actual or imminent violations of U.S. export control laws involving activities and business practices by his manager, Mr. Deutsch.  In Mr. Marullo's view, these apparent violations were due to fraudulent conduct by his manager which had major implications for the Company's overall security and presented serious legal and business exposure, which could significantly impact Rivian's reputation, operations, and stock price.

53.    A couple of months after he started working at Rivian, Mr. Marullo noticed that his boss, Mr. Deutsch, was bringing in unusual people for contractor support to provide various technical tools and for other purposes.

54.    Over time, Mr. Marullo found out that these people were largely friends or friends-of-friends of Mr. Deutsch, many of whom worked for Israeli cybersecurity companies.

55.     In many cases, Mr. Deutsch was giving these contractors and vendors "sole source" contracts, based purely on personal relationships rather than Company needs, price, or other legitimate factors.

56.     Mr. Deutsch pressured Mr. Marullo to use these companies, even after he asked why they were using only these vendors and companies to the exclusion of other reputable, experienced and more competitive vendors.

57.     In June and August 2021, Mr. Marullo raised the issue squarely with Mr. Deutsch, telling him, among other things, that: "We've got to be a lot more careful here.  What you're doing is inappropriate.  We need a lot more transparency."

58.     Mr. Marullo told his manager that he believed Mr. Deutsch's business practices were a conflict of interest that was being hidden from the Company, was not ethical, and violated federal export control laws, which restrict the export of military technology and other restricted technology and require export control approvals.

59.     Department of Commerce rules and regulations would apply to much of the technology Mr. Deutsch had sent abroad to these vendors.

60.     Mr. Marullo also sent Mr. Deutsch Slack messages regarding these issues.

61.     For example, most of the Company's source code for software under
development was being sent to vendors in Israel by Mr. Deutsch himself or at his
behest in order for those contractors to analyze its security.

62.     Mr. Marullo raised concerns about the legality and deceptive nature of
this specific practice as well, including concerns about conflicts of interest and
possible disadvantages in using virtually only vendors and contractors with whom
Mr. Deutsch had personal connections.  Mr. Marullo feared that these contractors
were being retained and paid by the Company under false, fraudulent pretenses, as
they had not been vetted or taken on based upon the usual decision-making
practices or legitimate factors.

63.     Mr. Marullo believed and/or knew that the Company had not been
made aware of the nature of the relationship between these vendors and Mr.
Deutsch (and the benefits accruing to Mr. Deutsch and disadvantages to the
Company as a result), and therefore believed that his manager's actions constituted
fraudulent conduct against Rivian.

64.     Mr. Marullo raised his concerns in writing with Human Resources
("HR") on or around October 5, 2021.  In his written complaint, Mr. Marullo
expressly referred to Mr. Deutsch having:

- "Engag[ed in] unethical business practices involving improper personal relationships with suppliers who have been awarded non[-]competitive sole source contracts;"

- "Coerced me into using a specific supplier who has a known conflict of interest with Rivian;"

- "[T]hreatened to share insider and confidential 3rd party testing results with another vendor in order to affect the change of the objective testing results;" and

- "Verbally reprimanded me on a team call about military leave."

65. Mr. Marullo also noted in his written complaint that Mr. Deutsch had "[c]reated a toxic environment of mistrust and favoritism" in the group, and that he had targeted Mr. Marullo with disparaging remarks to suppliers, directed him to water down his accomplishments in performance documents, and would not consider him for any promotion. Mr. Marullo noted this conduct to provide examples of Mr. Deutsch's retaliation against him for pushing back on the various improper practices.

66. Mr. Deutsch targeted Mr. Marullo for mistreatment due to his displeasure about Mr. Marullo's pushback and objections to his business practices and raising related potential legal violations, as well as his need to take time away from work for his Reserves service and duties.

67.    Unfortunately, now that Mr. Marullo had escalated his concerns and put some of them in writing, the retaliation by Mr. Deutsch, as well as that of the Company, was about to ratchet up.

## III.    RIVIAN UNLAWFULLY RETALIATES AGAINST MR. MARULLO

68.    Mr. Deutsch immediately began further retaliating against Mr. Marullo after the filing of his written complaint to HR in early October 2021. Suddenly, he directed Mr. Marullo to cease work on initiatives that they had been developing for months or longer (such as contracts with key suppliers), and to instead work on things that were not a high priority or even on anyone's radar, and/or which were outside Mr. Marullo's duties or far below his area of responsibility.

69.    Mr. Deutsch also purposefully left Mr. Marullo out of critical meetings that involved discussions and key decisions about manufacturing cybersecurity in which he normally would have participated.

70.    In addition, Mr. Deutsch took away Mr. Marullo's budget and assumed control of any funds that previously had been subject to Mr. Marullo's direction.

71.     On October 16, 2021, Mr. Deutsch sent Mr. Marullo an email that
angrily noted "from reading these lines I understand that you interpret *feedback* as
*blocking*." (emphasis in original).

72.     Mr. Deutsch wrote this email in direct response to concerns raised by
Mr. Marullo in an email earlier that day (including with regard to the possible
blocking of hiring a candidate and sudden cancellation of Mr. Marullo's work on a
contract with a key supplier, among other examples of interference with him).

73.     This conduct by Mr. Deutsch conformed to a pattern that had been
developing over several months, in which Mr. Deutsch would take a calmer, and
sometimes even a collegial tone, in written communications, while being
extremely harsh on phone or video calls, even yelling at and threatening Mr.
Marullo.

74.     The Company investigated Mr. Marullo's complaint over a couple of
months.  The investigators interviewed Mr. Marullo, and he provided them with a
list of potential evidence and exhibits.

75.     In addition to what was discussed in his written complaint, Mr.
Marullo reported other violations and troubling practices in his investigatory
interview, including but not limited to what he believed were violations of federal
export control laws and ethics violations.

76.     Mr. Marullo expressed his concerns to the investigators in terms of the Company's exposure to Mr. Deutsch's engaging in fraud and legal violations, as well as a concurrent strong risk to its value and stock price.

77.     Rivian, a top American electronic vehicle manufacturer, obviously is doing business and will do business in international markets.  Therefore, failure to comply with export laws would have a serious impact on its ability to function or make sales in vital markets, directly threatening shareholder interests.  In addition, actions that compromised the confidentiality and protection of Rivian's most sensitive data and proprietary information also could seriously damage its business and the interests of its shareholders.  Further, failing to disclose such a knowing violation would constitute a material omission, if not an outright misrepresentation, to the Company's shareholders.

78.     Indeed, these are not the only instances of disregard for ethics and proper business practices that Mr. Marullo personally observed and learned about while at Rivian.  For example, the departure of Chief Operating Officer Rod Copes was publicly communicated as a retirement and Chief Information Officer Madhavi Isanaka also was said to have left Rivian voluntarily in or around December 2021.  However, this was not true, as Mr. Mahdavi was terminated after

multiple HR investigations and Mr. Copes also was terminated shortly after that, which is the reason that Mr. Marullo's team started reporting to Wassym Bensaid.

79.     In addition, Mr. Marullo is aware that Rivian has used an employee vehicle purchase program to test the safety of its vehicles while reducing and avoiding public exposure.  In two different incidents, significant issues with vehicles that Mr. Marullo does not believe were disclosed came up.  In one, a team member's Rivian R1T vehicle went into "turtle mode" on the road, only allowing him to drive 18 miles per hour or less, just three weeks after getting the vehicle. On another occasion, an employee's R1T car had serious software issues that were found in many other units as well, which required the employee to put the car in the shop, again just weeks after it was delivered.

80.     In addition, sales of Rivian vehicles through its employee purchase plan have been used to inflate the Company's sales numbers, with most R1T vehicles first going to employees rather than actual, outside customers among the public.  This practice not only allowed for embellishment of sales numbers to please shareholders and the market, but also allow for beta testing and identifying quality issues without putting cars in the hands of members of the public who presumably would report them outside the Company.

81.    On November 2, 2021, Mr. Marullo received a curious meeting request from HR, which he accepted.  Mr. Marullo asked what the subject matter was, but was not told what the meeting was about.

82.    He thought it likely would be another investigatory interview, but when he joined the meeting HR was there, along with Christine Cannella, the Company's Chief Labor and Employment Counsel.

83.    On the call, they told him that they had a position for Mr. Marullo on another team, that he would maintain the same level, and that it was a good opportunity because "there is friction with your current manager."

84.    Mr. Marullo initially said that he was open to another position. However, it turned out that the new, proposed job had nothing to do with cybersecurity, had no budget, and in general was a much less desirable job.

85.    Mr. Marullo, upon learning what was being proposed, explained that he had been hired for and had accepted a specific position in order to use his particular skill set (cybersecurity in a manufacturing setting), and that he was a high performer with great relationships in the function, all of which he did not want to leave behind.

86.    He also said that he believed this was a continuation of the campaign of retaliation that had been started by his manager.

87.    Mr. Marullo also gave examples of other people at the Company who would be suited to the position they supposedly were trying to fill on another team.

88.    This new attempt to squeeze him out of his job caused Mr. Marullo a tremendous amount of stress (which he shared with a representative of HR).  At this point, both HR and the legal department ("Legal") apparently were also working to sideline him and drive him out of the Company.

89.    On November 5, 2021, Mr. Marullo reported to a different in-house attorney (who was brought on to replace the previous lawyer due to Mr. Marullo's retaliation concerns) on a video conference that his manager, Mr. Deutsch, was retaliating against him for his October 5, 2021 complaint.

90.    Mr. Marullo had also noted this retaliation by the Company on November 2, 2021, and wrote that he had been told to: "consider a transfer to a much less desirable position and specifically in your [Christine Cannella of Legal] words 'that this could be a very different conversation.'  It was a very intimidating statement, and it was clear by your tone that I should take the job transfer or be terminated, constructive or otherwise."

91.    Mr. Marullo clearly conveyed in this message that he understood the proposed transfer as coming with a direct "or else" type of threat, and that his job was in danger if he did not accept an inferior job outside his function.  The context

21

of these threats and these actions made it obvious that they were caused by and in retaliation for his legally protected complaints.

92.     Rivian's initial public offering (IPO), taking equity in the Company public on the NASDAQ stock exchange, occurred on November 9, 2021.

93.     Mr. Marullo on multiple occasions reiterated his complaints amid the Company's investigation, including in further interviews, and new information continued to come to light regarding the vendors and Mr. Deutsch.

94.     On January 7, 2022, the Company informed Mr. Marullo that the investigation into his concerns was over and that "we [the Company] were able to ***partially substantiate*** the allegations you identified in your complaint."  (emphasis in original).

95.     On this same day, Mr. Marullo also learned that Mr. Deutsch had been terminated.  Mr. Marullo reiterated to the Company's representatives his concerns about Mr. Deutsch's fraudulent conduct and any retaliation that he might be targeted for due to his complaints.  He also inquired about why Mr. Deutsch had been terminated and what portions of his complaints had been substantiated, including those regarding apparent defrauding of the Company and self-dealing, but he was not provided with any substantive information.

96.     Mr. Marullo now reported to his manager's boss, Wassym Bensaid, Vice President of Software, who reports directly to Rivian's Chief Executive Officer.

97.     Unfortunately, just days later, his new manager began peppering Mr. Marullo with hostile emails, making unreasonable demands, and proposing actions that Mr. Marullo explained would create safety and/or manufacturing issues.

98.     For example, Mr. Bensaid was proposing initiatives that would create unsafe conditions in the manufacturing plant by directing and requiring Mr. Marullo to conduct penetration testing on sensitive safety equipment.  Issues that could have been caused by the types of testing that Mr. Bensaid was pushing for without proper advance discussion included fire caused by disruption of safety processes and mechanisms.  Yet, Mr. Bensaid was demanding quick, ad hoc testing on all relevant devices.  Mr. Marullo made it clear that this would not be safe and posed substantial risk to the Company, its facilities, and employees.

99.     Rivian's Normal, Illinois manufacturing plant has a history of troubling safety events, including a major fire on the battery assembly line that caused an evacuation of the entire plant and a plant shutdown of more than 24 hours.  With this in mind, Mr. Marullo knew that any intentional interference with

the plant's safety equipment could provide disastrous for the Company's reputation and stock value, and more importantly could put many employees in danger.

100.   Indeed, upon information and belief, dozens of safety complaints have been filed with OSHA about Rivian's Illinois manufacturing facility during the past two years alone, including regarding exposure of employees to carbon monoxide at unsafe levels, electrical hazards, exposure to toxic and hazardous chemicals, and a serious battery fire that released toxins into the air at the workplace.

101.   Mr. Bensaid also demanded that Mr. Marullo request an entire shutdown of the plant to conduct and stage invasive and irresponsible cybersecurity events that would have posed serious operational and security risks. In addition, these actions likely would have and appeared intended to cast a negative light on Mr. Marullo due to how disruptive they would have been at a minimum, and how damaging they could have proved to be if he had carried them out.

102.   In Mr. Marullo's experience in the field of manufacturing cybersecurity, he knew that these requests would create significant human and environmental safety risks and liabilities for the Company.

103.   Mr. Bensaid had both a professional and personal relationship with Mr. Deutsch, and they would frequently have dinner and other meals together and go out for drinks and entertainment when the two of them were at the manufacturing plant in Illinois.

104.   Mr. Bensaid was outwardly displeased with Mr. Marullo for having made the complaints that led to his colleague's termination.

105.   Just two weeks later, on or around January 25, 2022, Mr. Marullo received a negative performance review—the first negative review he received at Rivian.

106.   The next day, Mr. Marullo had a "recharge session," which is a quarterly check-in on his compensation, in which it was falsely stated that Mr. Marullo was not meeting his production goals, and that he did not get along with people.

107.   He was also given goals for the next quarter.  Mr. Marullo was discouraged by this new, blatant retaliation, coming after he had a glimmer of hope that he could begin again with a fresh start after the Company's termination of Mr. Deutsch (which Rivian would not have carried out if he had not raised legitimate concerns regarding fraudulent and unethical practices).

108.   On January 27, 2022, Mr. Marullo was summarily terminated, without any notice.  He had not been given any warning, including in meetings with management on January 25 or 26, 2022.

109.   Mr. Marullo's firing came in the wake of the blatant and escalating retaliatory conduct and animus of Mr. Deutsch and others in the Company's management and HR/Legal functions.  It also was barely three months after his written protected complaint.

110.   Mr. Marullo lost all of his restricted stock units (RSUs) as a result of his termination, and he was offered approximately $40,000 in severance in exchange for a waiver and release of all legal claims against the Company.

111.   Mr. Marullo was not provided an explanation for his termination beyond a general reference to performance.

112.   Contrary to what he was told about "not getting along" with his colleagues a couple of days before his termination, Mr. Marullo heard from various coworkers after his termination, wishing him well and expressing regret that he had been let go and was no longer at the Company.

113.   Indeed, this type of subjective, vague, and all-purpose termination reason (which probably could be applied to nearly every supervisor or manager at some point) only demonstrates that Mr. Marullo's technical performance was

strong.  Further, the focus on Mr. Marullo's supposed attitude or ability to go-along-to-get-along shows that the Company was in fact focused on whether or not he would acquiesce to the wishes of his managers and/or others at the Company who wanted him to suppress his legitimate complaints and reports about misconduct and safety at Rivian.

114.   Therefore, Rivian's proffered and even shifting reasons for Mr. Marullo's termination bolster the retaliatory connection between his termination and his protected activity.  Mr. Marullo's legally protected complaints about Mr. Deutsch's fraudulent and improper activities and pressure on him regarding his Reserves service gave rise to the retaliatory animus that was behind his swift retaliatory termination.

## FIRST CAUSE OF ACTION
### (Retaliation in Violation of the Sarbanes-Oxley Act)

115.   Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

116.   As set forth above, Plaintiff made various protected complaints to Defendants concerning, *inter alia*, suspected and apparently imminent fraud by a member of Company management, legal violations such as violations of federal export control laws, which restrict the export of military technology and other restricted technology, conflicts of interest and legal violations which implicate

various species of fraud and fraudulent activity and misrepresentations, as well as activities which threatened the interests of and violated obligations to Rivian's shareholders, and violations of laws, regulations, and rules enforced by the SEC.

117.   Defendants violated the Sarbanes-Oxley Act by taking adverse employment actions against Plaintiff, including, but not limited to, retaliatorily terminating him, as well as subjecting him to harassment, leaving him out of meetings, canceling his projects, taking away his responsibilities and budget and assuming control of any funds that had been subject to his direction, attempting to force a transfer to a much less desirable position, and denying him pay increases and/or promotion.

118.   As a direct and proximate cause of Defendants' retaliatory conduct, Plaintiff has suffered, and will continue to suffer, severe financial, mental and emotional distress, hardship and injury, including loss of compensation, damage to his reputation, reduced possibilities for equivalent future compensation, and other additional damages, including interest, attorneys' fees, costs, and disbursements.

119.   Defendants' conduct was in violation of federal, state, and local laws and regulations, including the Sarbanes-Oxley Act, entitling Plaintiff to an award of damages in an amount to be established at a hearing, plus interest, attorneys' fees, costs, and disbursements.

## **PRAYER FOR RELIEF**

Plaintiff is seeking the following relief:

A.      Back pay, front pay, raises, and bonuses (including but not limited to

the stock units and/or cash value of any securities or the like that had been and

would have been granted as part of his compensation), various performance-based

compensation, deferred compensation, benefits, reinstatement (including of

seniority and tenure), and all other orders and remedies necessary to make Plaintiff

whole;

B.      An order requiring Defendants to abate and refrain from any further

violations of the whistleblower provisions of the Sarbanes-Oxley Act;

C.      An order prohibiting Defendants from disclosing any disparaging

statements about Plaintiff to prospective employers, or otherwise interfering with

any applications he might make in the future;

D.      Compensatory monetary damages in an amount determined to be fair

and equitable compensation for Plaintiff's physical and emotional distress and loss

of reputation; and

E.      Reasonable attorneys' fees for Plaintiff's attorneys and the costs of

this litigation, including but not limited to reimbursement of all costs, including but

not limited to deposition fees, witness fees, travel expenses, and other expenses to

present, collect and produce evidence in this matter.

Dated: February 16, 2023

Respectfully Submitted,

**WIGDOR LLP**

By: _____

Lawrence M. Pearson
*Pro Hac Vice to be filed*
NY. Bar # 3954591
85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
lpearson@wigdorlaw.com


*Counsel for Plaintiff*

**HALL & LAMPROS, LLP**

/s/ *Brittany A. Barto*
Christopher B. Hall
Ga. Bar # 318380
Brittany A. Barto
Ga. Bar # 501673

300 Galleria Parkway
Suite 300
Atlanta, GA 30339
(404) 876-8100 telephone
(404) 876-3477 facsimile
chall@hallandlampros.com
brittany@hallandlampros.com

*Counsel for Plaintiff*

Plaintiff's counsel certifies that this complaint is in 14-point Times New Roman font.